

IN OPEN COURT

MAY 2 4 2018

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

UNITED STATES OF AMERICA    )
                            )
     v.                     )    CRIMINAL NO. 2:18cr 76
                            )
KHALIL NAIM,                )
                            )
     Defendant.             )

STATEMENT OF FACTS

The parties stipulate that the allegations in the Criminal Information and the following

facts are true and correct, and that had the matter gone to trial the United States would have

proven them beyond a reasonable doubt.

1.      The defendant, KHALIL NAIM, is married to E.N.   In the early 2000s, Naim and

E.N. decided to start a small business, Firm A, based on Naim's experience selling software and

other computer-related services.   In March 2001, E.N. incorporated Firm A in the

Commonwealth of Virginia with E.N. as Firm A's sole owner.   Early in Firm A's history, E.N.

managed the company's operations and Naim managed its sales.

2.      In July 2001, Firm A applied to join the Section 8(a) program overseen by the

Small Business Administration ("SBA").   Under this program, small businesses owned and

controlled by economically and socially disadvantaged persons are eligible to obtain various

kinds of SBA assistance and to receive certain preferences in the award of federal contracts.   For

example, in certain circumstances, federal contracting officials can award procurements to 8(a)

firms on a "sole source" basis, meaning that such contracts can be awarded absent competing

offers from other firms.   In addition, federal contracting officers can, subject to certain

limitations, restrict competition on a procurement to 8(a) firms. These opportunities are colloquially known as "set-aside" contracts.

3. A firm is eligible to join the 8(a) program if "it is a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals." 13 C.F.R. § 124.101. In addition, "no non-disadvantaged individual or immediate family member may . . . [e]xercise actual control or have the power to control" an 8(a) firm. 13 C.F.R. § 124.106(e)(1). When Firm A applied to join the 8(a) program, it did so on the basis of E.N.'s disadvantaged status as the sole owner of the company.

4. Firm A received its 8(a) certification from the SBA in November 2001. The certification lasted for a non-renewable term of nine years, expiring in November 2010.

5. In December 2001, Firm A submitted its business plan to the SBA. The plan explained that Firm A's primary business was selling software and related products and services.

6. Between 2001 and 2005, Firm A experienced only limited success. Between December 2001 and November 2004, for example, it reported to the SBA that it had earned $0 in sales through the 8(a) program. During this period, Firm A's offices were in Chantilly, Virginia, near where Naim and E.N. lived.

7. In or about spring 2005, Firm A's business model changed entirely. At that time, Naim attended a meeting in Virginia Beach with a friend and business acquaintance, Person Y. Person Y was an owner of a Virginia Beach company whose primary business was selling products to the federal government. Because that company was not owned by a socially or economically disadvantaged person, it was not eligible to compete for 8(a) set-aside contracts. Even so, Person Y explained to Naim how Person Y's company could access the market for 8(a) contracts by partnering with an 8(a) company such as Firm A. Naim and Person Y agreed that



Firm A would shift its focus from selling software to working with Person Y's company to sell products to government customers through the 8(a) program.

8.      In or about spring 2005, Person Y also introduced Naim to Person Z.   Person Y told Naim that Person Z was a consultant for his company, had extensive experience pursuing 8(a) contracts, and could assist Naim in managing Firm A's business from Virginia Beach.

9.      As part of this arrangement, in or about July 2005, E.N. signed a Teaming Agreement that obligated Firm A to purchase products used to fulfill government contracts from Person Y's company.

10.     Also as part of this arrangement, in or about July 2005, E.N. signed an employment agreement with Person Z.   The agreement, which was not drafted by E.N. or Naim, stated that Firm A "desire[d] to expand its business pertaining to the sale of [products] . . . to . . . governmental entities."   It also stated that Person Z "ha[d] expertise in obtaining contracts . . . on behalf of 8(a) firms for the sale of [products] to Government Customers."   The agreement described Person Z as a "consultant" for Person Y's company and expressly stated that Person Z could continue "his affiliation" with that company notwithstanding his employment with Firm A.

11.     Within months, and by the latest in or about January 2006, Firm A's operations shifted almost entirely to Virginia Beach, where Person Y's company was located.   As Firm A's focus on the sale of products purchased from Person Y's company increased, E.N.'s involvement in the company decreased.   By January 2006, E.N. had ceded practically all control of Firm A to Naim and Person Z, who together managed the company's day-to-day operations and sales efforts.



12. Likewise, by January 2006 Naim began making regular trips to Virginia Beach to manage Firm A. While E.N. periodically traveled to Virginia Beach to spend time with Naim, E.N. did not conduct business on these trips.

13. Firm A continued to participate in the 8(a) program through November 2010. During this period, E.N. had practically no insight into Firm A's business even though E.N. purportedly controlled the company.

14. After November 2010, Firm A was no longer eligible to compete for 8(a) contracts. It did, however, compete for contracts awarded under other SBA set-aside programs.

15. In addition to the 8(a) program, the SBA administers other programs designed to support women-owned small businesses. To that end, the Small Business Reauthorization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763A-708, added 15 U.S.C. § 637(m) to the federal code, which authorizes federal contracting officers to restrict competition to eligible Women-Owned Small Businesses ("WOSBs") for procurements in certain industries. To be eligible to compete for WOSB set-aside contracts, a business must be at least "51 percent owned by one or more women," 15 U.S.C. § 637(m)(2)(A), and "the management and daily business operations of the business [must be] controlled by one or more women," 15 U.S.C. §§ 637(m)(1)(B), 632(n)(2).

16. WOSBs must certify to the federal government that they are eligible to participate in the WOSB program. These certifications must include a representation that the firm is "is at least 51 percent owned and controlled by one or more women." 13 C.F.R. § 127.300(b)(2)(ii). When a federal contracting officer chooses to restrict competition on a procurement to WOSBs, the officer must verify that the firms competing for the procurement are certified as "small business concern[s] owned and controlled by women." 15 U.S.C. § 637(m)(2)(E). In this

4

context, "[c]ontrol by one or more women . . . means that both the long-term decision making and the day-to-day management and administration of the business operations must be conducted by one or more women." 13 C.F.R. § 127.202(a).

17.    During the period relevant to the Criminal Information, the federal government maintained a database known as the Online Representations and Certifications Application system, or "ORCA," in which government contractors could complete certifications required under various federal contracting programs. In 2010, 2011, and 2012, Firm A certified in ORCA that it was a women-owned business concern "whose management and daily business operations [were] controlled by one or more women." Because E.N. exercised practically no control over Firm A during this period, these certifications were false and misleading.

18.    In or about Fall 2012, the U.S. Department of State publicly advertised a solicitation that was restricted to WOSBs. An employee of Person Y's company circulated the online posting to an employee of Firm A, encouraging Firm A to compete for the business. Firm A ultimately won the procurement and agreed to supply the government with the required items for a price of $479,641.23.

19.    According to sales records, Firm A purchased the items used to satisfy the contract described above from Person Y's company for a price of $459,500. A spreadsheet of profit margins maintained by Firm A indicates that, on this particular contract, it made a net profit of $10,160. Records maintained by Person Y's company indicate that it made a net profit of $40,300 relating to this procurement.

20.    Firm A was not, in fact, eligible to compete for or win the contract described in ¶ 18 because, when the procurement was advertised and the contract was awarded, neither "the

5



long-term decision making [nor] the day-to-day management and administration" of Firm A was "conducted by one or more women" within the meaning of 13 C.F.R. § 127.202(a).

21.     On or about April 4, 2013, the SBA sent a letter to Firm A regarding its eligibility to participate in the WOSB program.  The letter, addressed to E.N., identified numerous pieces of public information that raised doubts about Firm A's status and E.N.'s role within the company.  In particular, the letter noted that the SBA could not verify that E.N. either controlled the company or managed it on a full-time basis.  The SBA asked Firm A to respond within fifteen days.

22.     On or about April 12, 2013, Person Z drafted an email asking for an extension of time of ten days for Firm A to send its response to the SBA.  Person Z sent the draft email to E.N., who sent it nearly verbatim from E.N.'s email account to the SBA a few days later.

23.     On or about April 19, 2013, E.N. sent Firm A's response to the SBA.  Firm A's letter, addressed to the Director of the Office of Government Contracting at the SBA, contained numerous materially false, fictitious, and fraudulent statements.  These included:

   a. "I [E.N.] am the final decision maker of my company's operations and
      finances, and I am fully involved in the everyday operation of my firm."
      This was false.  E.N. had ceased to be involved in Firm A's everyday
      operations as early as 2006.

   b. "I [E.N.] commute weekly to Virginia Beach to run Firm A."  This was false.
      E.N. did not commute to Virginia Beach on a weekly basis, and when E.N.
      did travel to Virginia Beach it was not to run Firm A but to spend time with
      Naim.

6



   c. "All final decisions are made by me and include finances, company strategy and mission, hiring and firing of personnel, and operations."  This was false.  In reality, Naim and Person Z handled most or all of these functions.

   d. "[Naim] and [Person Z] serve as Executive Vice Presidents, but do not exercise actual control or have the power to control the concern."  This was false.  In reality, Naim and Person Z exercised control over Firm A; E.N. did not.

24.     In sending the April 19 letter, Naim and E.N. had two goals.  First, they hoped to maintain their ability to compete for WOSB set-aside contracts in the future.  Second, they wanted to dissuade the SBA from investigating E.N.'s past role within Firm A or from questioning Firm A's eligibility in winning past WOSB set-aside contracts.

25.     Naim assisted in the preparation of the April 19 letter by, among other things, suggesting language and reviewing one or more drafts.  Naim took these affirmative acts knowingly and willfully, fully aware that the letter contained materially false, fictitious, and fraudulent statements, with the intent to facilitate the transmission of those false statements to the SBA.  At the time he assisted in preparing the April 19 letter, Naim knew that making materially false, fictitious, and fraudulent statements to the SBA was unlawful.

26.     The false, fictitious, and fraudulent statements in the April 19 letter were material to the SBA because they had the natural tendency to influence and were capable of influencing the SBA's actions—in this case, the SBA's ultimate determination about Firm A's eligibility for the WOSB program.



27.     Naim assisted in the preparation of the April 19 letter while he and E.N. lived within the Eastern District of Virginia and while Firm A was headquartered in Virginia Beach, Virginia, within the Eastern District of Virginia.

28.     This Statement of Facts is a summary of the principal facts that constitute the legal elements of the offense charged in the Criminal Information.   This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that could be used to determine Naim's sentence under the Sentencing Guidelines. Naim acknowledges that the foregoing Statement of Facts does not describe all of his conduct relating to the offense charged in the Criminal Information nor does it identify all of the persons with whom Naim may have engaged in illegal activities.

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney

By:     _____

Daniel T. Young
Alan M. Salsbury
Assistant United States Attorneys



After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Khalil Naim, Defendant


I am Khalil Naim's attorney.   I have carefully reviewed the above Statement of Facts with him.   To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Trey R. Kelleter, Esq.
Attorney for Khalil Naim

9